UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO.   3:20-cr-00175 - RNC

JPMORGAN CHASE & CO.

**DEFERRED PROSECUTION AGREEMENT**

Defendant JPMorgan Chase & Co. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office"), enter into this deferred prosecution agreement (the "Agreement"). The Company's subsidiaries, JPMorgan Chase Bank, N.A. ("JPMC"), and J.P. Morgan Securities LLC ("JPMS") (together, the "Related Entities"), also agree, pursuant to the authority granted by their respective Boards of Directors, also reflected in Attachment B, to certain terms and obligations of the Agreement as described below. The terms and conditions of this Agreement are as follows:

**Criminal Information and Acceptance of Responsibility**

1.      The Company acknowledges and agrees that the Fraud Section and the Office will file the attached two-count criminal Information in the United States District Court for the District of Connecticut charging the Company with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343. In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect

to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut. The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company and the Related Entities admit, accept, and acknowledge that they are responsible under United States law for the acts of their officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company and the Related Entities agree that, effective as of the date they sign this Agreement, in any prosecution that is deferred by this Agreement, they will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company and the Related Entities agree not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company and the

Related Entities agree, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company or the Related Entities have knowingly violated any provision of this Agreement or have failed to completely perform or fulfill each of their obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the right of the Fraud Section and the Office to proceed as provided in Paragraphs 24-27 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), the Term shall be deemed to have not begun, and all the provisions of this Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

### **Relevant Considerations**

4.     The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and by the Company and the Related Entities, including:

a.     The nature and seriousness of the offense conduct, which involved tens of thousands of instances of unlawful trading in gold, silver, platinum, and palladium

("precious metals") futures contracts by ten former traders on the precious metals desk of the Company and the Related Entities resulting in at least $205,992,102 of loss to other precious metals futures market participants between March 2008 and August 2016, as well as thousands of instances of unlawful trading in U.S. Treasury futures contracts and in U.S. Treasury notes and bonds in the secondary ("cash") market by five former traders on the U.S. Treasuries desk of the Company and the Related Entities resulting in at least $105,744,906 of loss to other U.S. Treasury futures and cash market participants between April 2008 and January 2016, all resulting in significant harm to the integrity of core United States commodities and securities markets;

      b.    The Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

      c.    The Company received credit for its cooperation with the Fraud Section's and the Office's investigation into both the precious metals and U.S. Treasuries conduct, including conducting a thorough internal investigation, making factual presentations to the Fraud Section and the Office, voluntarily making foreign-based employees available for interviews in the United States, producing documents to the Fraud Section and the Office from foreign countries in ways that did not implicate foreign data privacy laws, and proactively identifying for the Fraud Section and the Office important documents and information even when those documents and information were not favorable to the Company, notwithstanding the fact that earlier in the Fraud Section's and the Office's investigation of the precious metals conduct the Company was unable to provide a complete list of trader IDs;

d.      The Company and the Related Entities engaged in remedial measures, including suspending (and ultimately terminating) any employees still working at the Company, the Related Entities, and their affiliates that were involved in the conduct described in the Statement of Facts, although the suspensions of employees on the precious metals desk occurred several months after the Fraud Section and the Office notified the Company of their investigation and only after a second individual involved in the precious metals conduct had pleaded guilty;

e.      The Company provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section and the Office prior to the Agreement;

f.      The Company's prior criminal history includes a guilty plea on May 20, 2015, for similar misconduct involving manipulative and deceptive trading practices in the foreign currency exchange spot market (the "FX Guilty Plea");

g.      The Company and the Related Entities have enhanced and have committed to continuing to enhance their compliance program and internal controls, including ensuring that their compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program).   In particular, following the FX Guilty Plea, the Company and the Related Entities engaged in a systematic effort to reassess and enhance their market conduct compliance program and internal controls, including by:

(i)       hiring hundreds of new compliance officers, spending over $335 million on personnel and other compliance-related costs, and increasing Internal Audit's budget by almost $100 million and its headcount by approximately 400;

(ii)       improving their anti-fraud and manipulation training and policies, for example, the Company's 2019 Business Conduct Training included specific scenarios covering different products and dedicated spoofing sections that highlighted regulators' concerns, key definitions, and a discussion of "Dos" and "Don'ts" and the Company has continued to issue compliance bulletins highlighting lessons learned from cases brought against traders and firms that were found to have engaged in spoofing;

(iii)       revising their trade and electronic communications surveillance programs, for example, the Company's systems now surveil trades on over 80 equities exchanges and over 40 futures and options exchanges. The Company also continues to refine its spoofing surveillance, modifying its spoofing parameters in response to lessons learned in the instant case and related interactions with exchanges and regulators, and currently uses three primary alert types within SMARTS to detect potential spoofing, including spoofing by layering orders;

(iv)       increasing their electronic communications surveillance program by, on a monthly basis, the Company's communications surveillance platforms automatically ingesting and processing approximately 100 million messages, and analysts review 100% of the alerts generated from these surveillances. The Company continues to update the universe of monitored employees and revise its

lexicons on a regular basis to address evolving risks as well as utilize technology that allows for lexicon-based surveillance of voice recordings;

(v)      implementing tools and processes to facilitate closer supervision of traders, for example, by implementing the Supervisory Portal which is a web-based, centralized tool that helps supervisors meet their oversight responsibilities. The Supervisory Portal presents supervisors with a consolidated view of metrics ranging from an employee's attendance at trainings to the number and type of trading-related alerts an employee has triggered. This allows a supervisor to make assessments about an employee's risk profile by considering diverse metrics that might be meaningful in combination but not in isolation. Supervisors are also required to review and affirm employees' conduct on a monthly basis, which incentivizes closer supervision. With regard to precious metals traders, Supervisory Portal reports contain granular information including, but not limited to, whether any trading was above applicable thresholds or required additional action and/or escalation;

(vi)      taking into account employees' commitment to compliance in promotion and compensation decisions by, among other things, soliciting direct feedback from risk and control professionals when reviewing employees who individually or collectively are responsible for risk-taking or risk management at the Company; and

(vii)      implementing independent quality assurance testing of non-escalated and escalated surveillance alerts, which identifies potential defects in alert documentation and promotes consistency in the dispositioning of alerts, and now

issues monthly spoofing alert reports that provide metrics on alerts by trader, desk, supervisor, and region.

h.      Accordingly, after considering (a) through (g) above, the Company received an aggregate discount of twelve-and-one-half percent off of the bottom of the otherwise-applicable Sentencing Guidelines fine range;

i.      Substantially all of the conduct described in the Statement of Facts occurred prior to the Company's FX Guilty Plea and to the significant changes to the Company's and the Related Entities' compliance program described in Paragraph 4(g) above;

j.      Based on the Company's and the Related Entities' remediation, the state of their compliance program, and the Company's and the Related Entities' agreement to report to the Fraud Section and the Office as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section and the Office determined that an independent compliance monitor was unnecessary;

k.      The Company and the Related Entities have agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 5, below;

l.      The Company and the Related Entities have agreed to enter into a separate resolution with the U.S. Commodity Futures Trading Commission ("CFTC") relating to the conduct described in the Statement of Facts; and

m.      JPMS has agreed to enter into a separate resolution with the U.S. Securities and Exchange Commission ("SEC") relating to the conduct described in the Statement of Facts regarding the trading of U.S. Treasury notes and bonds in the secondary cash market.

**Future Cooperation and Disclosure Requirements**

5.      The Company, the Related Entities, and their subsidiaries and affiliates shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section and the Office until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Fraud Section and the Office, the Company, the Related Entities and their subsidiaries and affiliates shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, the Related Entities, their subsidiaries and affiliates, or any of their present or former officers, directors, employees, and agents in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct.  The Company's, the Related Entities', and their subsidiaries' and affiliates' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company, the Related Entities, and their subsidiaries and affiliates must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company, the Related Entities, and their subsidiaries and affiliates bear the burden of establishing the validity of any such assertion.  The Company, the Related Entities, and their subsidiaries and affiliates agree that their cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.      The Company, the Related Entities, and their subsidiaries and affiliates shall truthfully disclose all factual information with respect to their activities and those of their present and former directors, officers, employees, agents, and consultants, including any

evidence or allegations and internal or external investigations, about which the Company, the Related Entities, and their subsidiaries and affiliates have any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company, the Related Entities, and their subsidiaries and affiliates to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Company, the Related Entities, and their subsidiaries and affiliates.

b.      Upon request of the Fraud Section and the Office, the Company, the Related Entities, and their subsidiaries and affiliates shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company, the Related Entities, and their subsidiaries and affiliates. It is further understood that the Company, the Related Entities, and their subsidiaries and affiliates must at all times provide complete, truthful, and accurate information.

c.      The Company, the Related Entities, and their subsidiaries and affiliates shall use their best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Company, the Related Entities, and their subsidiaries and affiliates. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, the Related Entities, and their

subsidiaries and affiliates, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company, the Related Entities, and their subsidiaries and affiliates consent to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company or the Related Entities learn of any evidence or allegation of (A) conduct which may constitute a violation of the wire fraud statute, Title 18, United States Code, Section 1343; or (B) conduct in the Global Markets, Global Rates & Rates Exotics, or Global Commodities lines of business in the Corporate and Investment Bank which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, (A) and (B), the "Securities and Commodities Laws"), the Company and the Related Entities shall promptly report such evidence or allegation to the Fraud Section and the Office.

**Total Criminal Monetary Amount**

7.      The Company and the Fraud Section and the Office agree that the Total Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $920,203,609, which

is comprised of the following components set forth below: (i) a Criminal Monetary Penalty of $436,431,811; (ii) a Criminal Disgorgement Amount of $172,034,790; and (iii) a Victim Compensation Payment Amount of $311,737,008.

8.      The Fraud Section and the Office agree that: (i) the Criminal Monetary Penalty may be offset by the amount of any payment made by the Company pursuant to the September 29, 2020 order and settlement between the Company and the CFTC; and (ii) that the Criminal Disgorgement Amount may be offset by the $10 million disgorgement payment made by JPMS pursuant to the September 29, 2020 order and settlement between JPMS and the SEC, both the CFTC and SEC resolution relating to the conduct described in the attached Statement of Facts.

9.      The Company acknowledges that no tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Monetary Amount or any other agreement entered into with an enforcement authority or a regulator, including the CFTC and SEC, concerning the facts set forth in the Statement of Facts.

## **Payment of Criminal Monetary Penalty**

10.     The Fraud Section and the Office and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b.      Offense Level.  Based upon USSG § 2B1.1, the total offense level is 39, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 7 |
| (b)(1)(O) | Loss of More Than $250,000,000 | +28 |

| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 39 |

c.   <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(3), the base fine is $311,737,008 (the loss from the offense, which is greater than the amount indicated in the Offense Level Fine Table)

d.   <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| (a) | Base Culpability Score | 5 |
| (b)(3) | The relevant unit of the organization had 200 or more employees and one or more individuals within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +3 |
| (c)(2) | The organization committed any part of the instant offense less than 5 years after a criminal adjudication based on similar misconduct | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 8 |

<u>Calculation of Fine Range</u>:

| Base Fine | $311,737,008 |
| Multipliers | 1.6 (min) / 3.2 (max) |
| Fine Range | $498,779,213 / $997,558,426 |

11.   The Company agrees to pay a criminal monetary penalty in the amount of $436,431,811 (the "Criminal Monetary Penalty") to the United States Treasury no later than ten (10) business days after the Agreement is fully executed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.  The Fraud Section and the Office and

the Company agree that this Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

12.     The Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section and the Office that $436,431,811 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section and the Office are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.

## Payment of Criminal Disgorgement Amount

13.     The Company hereby agrees to disgorge to the United States the sum of $172,034,790 (the "Criminal Disgorgement Amount").  The Company shall pay the Criminal Disgorgement Amount plus any associated transfer fees no later than ten (10) business days after the Agreement is fully executed, pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

14.     The Criminal Disgorgement Amount paid is final and shall not be refunded should the Fraud Section and the Office later determine that the Company has breached this Agreement and commence a prosecution against the Company.  In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section and the Office may pursue additional civil and criminal forfeiture in excess of the Criminal Disgorgement Amount. The Fraud Section and the Office agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the

Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

## Payment of Victim Compensation Amount

15.     The Company agrees to pay the amount of $311,737,008 in order to compensate victims for their losses as set forth in Paragraph 4(a) above (the "Victim Compensation Amount"). The Company shall pay the full Victim Compensation Amount to the United States no later than ten (10) business days after the Agreement is signed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

16.     The Fraud Section and the Office shall have sole discretion to determine how the Victim Compensation Amount will be disbursed.  The Company shall retain and pay the costs of a claims administrator for making victim compensation payments according to calculations and instructions provided by the Fraud Section and the Office in their sole discretion.

17.     The Company agrees that any part of the Victim Compensation Amount that remains unclaimed at the end of the Term shall revert to the United States in the form of an additional Criminal Monetary Penalty.

## Conditional Release from Liability

18.     Subject to Paragraphs 24-27, the Fraud Section and the Office agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company or the Related Entities relating to any of the conduct described in the attached Statement of Facts, the criminal Information filed pursuant to this Agreement, or in the Superseding Indictment filed in *United States v. Smith*, 19-cr-669, ECF No. 52 (N.D. Ill. Nov. 14, 2019); or any conduct on the Company's and Related Entities' precious metals desk or U.S. government bonds desk relating to manipulative trading in connection with triggering or defending precious metals barrier options

and to placing orders with no intent to execute in connection with the trading of precious metals futures contracts, U.S. Treasury futures contracts, and U.S. Treasury bonds and notes in the secondary ("cash") market during the relevant periods as defined in the Statement of Facts. The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company or the Related Entities: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

     a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company or the Related Entities.

     b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or the Related Entities.

### Corporate Compliance Program

19.    The Company and the Related Entities represent that they have implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Securities and Commodities Laws throughout their operations, including those of their affiliates, agents, and joint ventures (to the extent the Company or the Related Entities manage or control such joint ventures) and those of their contractors and subcontractors whose responsibilities relate to securities and commodities trading or supervision of securities and commodities trading, including, but not limited to, the minimum elements set forth in Attachment C.

20.     In order to address any deficiencies in their internal controls, policies, and procedures, the Company and the Related Entities represent that they have undertaken, and will continue to undertake in the future, in a manner consistent with all of their obligations under this Agreement, a review of their existing internal controls (including their trade surveillance tools), policies, and procedures regarding compliance with the Securities and Commodities Laws.  Where necessary and appropriate, the Company and the Related Entities agree to adopt a new compliance program, or to modify their existing ones, including internal controls, compliance policies, and procedures in order to ensure that they maintain an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of the Securities and Commodities Laws.  The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

21.     The Company and the Related Entities agree that they will report to the Fraud Section and the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C.  These reports will be prepared in accordance with Attachment D.

## Deferred Prosecution

22.     In consideration of the undertakings agreed to by the Company and the Related Entities herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company or the Related Entities that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

-17-

23.     The Fraud Section and the Office further agree that if the Company and the Related Entities fully comply with all of their obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Six months after the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.  If, however, the Fraud Section and the Office determine during this six-month period that the Company or the Related Entities breached the Agreement during the Term, as described in Paragraph 24, the Fraud Section's and the Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 24-27, remains in full effect.

## Breach of the Agreement

24.     If, during the Term, (a) the Company or the Related Entities commit any felony under U.S. federal law; (b) the Company or the Related Entities provide in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with their disclosure of information about individual culpability; (c) the Company, the Related Entities, or their subsidiaries and affiliates fail to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) the Company and the Related Entities fail to implement a compliance program as set forth in Paragraphs 19-20 of this Agreement and Attachment C; or (e) the Company or the Related Entities otherwise fail to completely perform or fulfill each of their obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company, the Related Entities, and their subsidiaries and affiliates

shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the United States District Court for the District of Connecticut or any other appropriate venue. Determination of whether the Company or the Related Entities have breached the Agreement and whether to pursue prosecution of the Company, the Related Entities, or their subsidiaries or affiliates shall be in the sole discretion of the Fraud Section and the Office. Any such prosecution may be premised on information provided by the Company, the Related Entities, their subsidiaries and affiliates, or their personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, the Related Entities, or their subsidiaries and affiliates, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company and the Related Entities agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company and the Related Entities agree that the statute of limitations as to any violation of the Securities and Commodities Laws that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

25.     In the event the Fraud Section and the Office determine that the Company or the Related Entities have breached this Agreement, the Fraud Section and the Office agree to provide the Company and the Related Entities with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company and the Related Entities shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company and the Related Entities have taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company or the Related Entities.

26.     In the event that the Fraud Section and the Office determine that the Company or the Related Entities have breached this Agreement: (a) all statements made by or on behalf of the Company, the Related Entities, or their subsidiaries and affiliates to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company, the Related Entities, or their subsidiaries and affiliates before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company, the Related Entities, or their subsidiaries and affiliates; and (b) the Company, the Related Entities, or their subsidiaries and affiliates shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that any such statements or testimony made by or on behalf of the Company, the Related Entities, or their subsidiaries and affiliates prior or subsequent to this Agreement, or any leads derived therefrom,

should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, the Related Entities, or their subsidiaries and affiliates will be imputed to the Company or the Related Entities for the purpose of determining whether the Company or the Related Entities have violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

27.    The Company and the Related Entities acknowledge that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company or the Related Entities breach this Agreement and this matter proceeds to judgment. The Company and the Related Entities further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

28.    On the date that the period of deferred prosecution specified in this Agreement expires, the Company, on behalf of itself and the Related Entities, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will submit the certification set forth in Attachment E and certify to the Fraud Section and the Office that the Company and the Related Entities have met their disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company and the Related Entities

29.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company and the Related Entities agree that in the event that, during the Term, they undertake any change in corporate form, including if they sell, merge, or transfer business operations that are material to the Company's or the Related Entities' consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the ability of the Fraud Section and the Office to breach under this Agreement is applicable in full force to that entity.  The Company and the Related Entities agree that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company and the Related Entities shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section and the Office shall notify the Company and the Related Entities prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  If at any time during the Term the Company or the Related Entities engage in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 24-27 of this Agreement.  Nothing herein shall restrict the Company or the Related Entities from indemnifying (or otherwise holding

harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

### Public Statements by Company and the Related Entities

30.     The Company and Related Entities expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company or the Related Entities make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company and the Related Entities set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company and the Related Entities described below, constitute a breach of this Agreement, and the Company and/or the Related Entities thereafter shall be subject to prosecution as set forth in Paragraphs 24-27 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company and/or the Related Entities for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section and the Office shall so notify the Company and the Related Entities, and the Company and the Related Entities may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company and the Related Entities shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and

claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company or the Related Entities in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company or the Related Entities.

31.     The Company and the Related Entities agree that if they, or any of their direct or indirect subsidiaries or affiliates, issue a press release or hold any press conference in connection with this Agreement, the Company and the Related Entities shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office, the Company, and the Related Entities; and (b) whether the Fraud Section and the Office have any objection to the release.

32.     The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's and the Related Entities' cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company or the Related Entities, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

33.     This Agreement is binding on the Company, the Related Entities, and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory

agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and the Related Entities and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company or the Related Entities.

## Notice

34.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Brian Kidd, Deputy Chief, Fraud Section, Criminal Division, United States Department of Justice, 1400 New York Avenue NW, Washington, DC, 20005 and to Jonathan Francis, Assistant United States Attorney, U.S. Attorney's Office for the District of Connecticut, Connecticut Financial Center, 157 Church Street, 25th Floor, New Haven, CT 06510.  Any notice to the Company and the Related Entities under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Stacey R. Friedman, General Counsel, c/o Office of the General Counsel, JPMorgan Chase & Co., 383 Madison Avenue, New York, New York 10017.  Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company and the Related Entities.

## Complete Agreement

35.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company, the Related Entities, and the Fraud Section and the Office.   No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company and for the Related Entities, and duly authorized representatives of the Company and the Related Entities.

AGREED:

FOR JPMORGAN CHASE & CO.:

Date: 9/25/20

By: _____
Stacey R. Friedman
JPMorgan Chase & Co.

Date: 9/25/20

By: _____
Alexander J. Willscher
Tracy Richelle High
SULLIVAN & CROMWELL LLP

Date: 9/25/20

By: _____
Mark Filip
Zachary S. Brez
Robert W. Allen
KIRKLAND & ELLIS LLP

FOR JPMORGAN CHASE BANK N.A.:

Date: _____

By: _____
Stacey R. Friedman
JPMorgan Chase & Co.

Date: 9/25/20

By: _____
Alexander J. Willscher
Tracy Richelle High
SULLIVAN & CROMWELL LLP

Date: 9/25/20

By: _____
Mark Filip
Zachary S. Brez
Robert W. Allen
KIRKLAND & ELLIS LLP

-26-

**FOR J.P. MORGAN SECURITIES LLC:**

Date: 9/25/20                    By: _____
                                      Stacey R. Friedman
                                      JPMorgan Chase & Co.

Date: 9/25/20                    By: _____
                                      Alexander J. Willscher
                                      Tracy Richelle High
                                      SULLIVAN & CROMWELL LLP

Date: 9/25/20                    By: _____
                                      Mark Filip
                                      Zachary S. Brez
                                      Robert W. Allen
                                      KIRKLAND & ELLIS LLP

**FOR THE DEPARTMENT OF JUSTICE:**

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 9/28/2020                    By: _____
                                         Avi Perry, Assistant Chief

Date: 9/28/2020                    By: _____
                                         Matthew F. Sullivan, Trial Attorney


JOHN H. DURHAM
United States Attorney
District of Connecticut

Date: 9/28/20                      By: _____
                                         Jonathan Francis
                                         Assistant United States Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for JPMorgan Chase & Co. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 9/25/20

By: _____

Stacey R. Friedman
General Counsel
JPMORGAN CHASE & CO.

## CERTIFICATE OF COUNSEL FOR JPMORGAN CHASE & CO.

I am counsel for JPMorgan Chase & Co. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 9/25/20                    By: _____
                                     Alexander J. Willscher
                                     SULLIVAN & CROMWELL LLP
                                     Counsel for JPMorgan Chase & Co.


Date: 9/25/20                    By: _____
                                     Mark Filip
                                     KIRKLAND & ELLIS LLP
                                     Counsel for JPMorgan Chase & Co.

## JPMORGAN CHASE BANK, N.A. OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for JPMorgan Chase Bank, N.A. ("JPMC"). I understand the terms of this Agreement and voluntarily agree, on behalf of JPMC, to each of its terms. Before signing this Agreement, I consulted outside counsel for JPMC. Counsel fully advised me of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of JPMC. I have advised and caused outside counsel for JPMC to advise the Board of Directors fully of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of JPMC, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for JPMorgan Chase & Co. and that I have been duly authorized by JPMC to execute this Agreement on behalf of JPMC.

Date: 9/25/20

JPMORGAN CHASE BANK, N.A.

By:

Stacey R. Friedman
General Counsel
JPMorgan Chase & Co.

## CERTIFICATE OF COUNSEL FOR JPMORGAN CHASE BANK, N.A.

I am counsel for JPMorgan Chase Bank, N.A. ("JPMC") in the matter covered by this Agreement. In connection with such representation, I have examined relevant JPMC documents and have discussed the terms of this Agreement with JPMC's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of JPMC has been duly authorized to enter into this Agreement on behalf of JPMC and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of JPMC and is a valid and binding obligation of JPMC. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of JPMC. I have fully advised them of the rights of JPMC, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the JPMC to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 9/25/20

By: _____
Alexander J. Willscher
SULLIVAN & CROMWELL LLP
Counsel for JPMorgan Chase Bank, N.A.

Date: 9/25/20

By: _____
Mark Filip
KIRKLAND & ELLIS LLP
Counsel for JPMorgan Chase Bank, N.A.

## J.P. MORGAN SECURITIES LLC OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for J.P. Morgan Securities LLC ("JPMS"). I understand the terms of this Agreement and voluntarily agree, on behalf of JPMS, to each of its terms. Before signing this Agreement, I consulted outside counsel for JPMS. Counsel fully advised me of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Managers of JPMS. I have advised and caused outside counsel for JPMS to advise the Board of Managers fully of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of JPMS, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for JPMorgan Chase & Co. and that I have been duly authorized by JPMS to execute this Agreement on behalf of JPMS.

Date: 9/25/26

J.P. MORGAN SECURITIES LLC

By: _____
Stacey R. Friedman
General Counsel
JPMorgan Chase & Co.

## CERTIFICATE OF COUNSEL FOR J.P. MORGAN SECURITIES LLC

I am counsel for J.P. Morgan Securities LLC ("JPMS") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant JPMS documents and have discussed the terms of this Agreement with JPMS' Board of Managers.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of JPMS has been duly authorized to enter into this Agreement on behalf of JPMS and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of JPMS and is a valid and binding obligation of JPMS.  Further, I have carefully reviewed the terms of this Agreement with the Board of Managers and the General Counsel of JPMorgan Chase & Co.  I have fully advised them of the rights of JPMS, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of JPMS to enter into this Agreement, based on the authorization of the Board of Managers, is an informed and voluntary one.

Date: _9/25/20_

By: _____
    Alexander J. Willscher
    SULLIVAN & CROMWELL LLP
    Counsel for JPMorgan Securities LLC